Slip Op. 07-133

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                               :
AMES TRUE TEMPER,              :
                               :
           Plaintiff,          : Before: Richard K. Eaton, Judge
                               :
           v.                  : Court No. 05-00581
                               :
UNITED STATES,                 :
                               :
           Defendant.          :
_____:
```

OPINION AND ORDER

[United States Department of Commerce's final results of the thirteenth administrative review of the antidumping duty orders on heavy forged hand tools from the People's Republic of China sustained in part and remanded.]

Dated: August 31, 2007

*Wiley Rein, LLP* (*Timothy C. Brightbill* and *Charles O. Verrill, Jr.*), for plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *Jeanne E. Davidson*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*); Office of Chief Counsel for Import Administration, United States Department of Commerce (*Scott McBride*), of counsel, for defendant.

Eaton, Judge: This matter is before the court on plaintiff Ames True Temper's ("Ames") motion for judgment upon the agency record pursuant to USCIT Rule 56.2. By its motion, Ames challenges certain aspects of the United States Department of Commerce's ("Commerce" or the "Department") final results for the

thirteenth administrative review of the four antidumping duty

orders covering imports into the United States of heavy forged

hand tools ("HFHTs") from the People's Republic of China ("PRC")

made between February 1, 2003, and January 30, 2004 ("POR").  *See*

*generally* Pl.'s Mem. Supp. Mot. J. Agency R. ("Pl.'s Mem."); *see*

*also* HFHTs, Finished or Unfinished, With or Without Handles, From

the PRC, 70 Fed. Reg. 54,897 (Dep't of Commerce Sept. 19, 2005)

("Final Results").

With the exception of plaintiff's changed circumstances

claim, *see infra* Part V., jurisdiction is had pursuant to 28

U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii)

(2000).  For the following reasons, Commerce's Final Results are

sustained in part and remanded.


BACKGROUND

Ames is a domestic producer of HFHTs.  On March 26, 2004,

pursuant to Ames's request, Commerce initiated the thirteenth

administrative review of the four antidumping duty orders

applicable to imports into the United States of heavy forged

bars/wedges, hammers/sledges, picks/mattocks and axes/adzes from

the PRC.  *See* Initiation of Antidumping and Countervailing Duty

Admin. Revs. and Requests for Revocation in Part, 69 Fed. Reg.

15,788, 15,789 (Dep't of Commerce Mar. 26, 2004); *see also* HFHTs,

Finished or Unfinished, With or Without Handles From the PRC, 56

Fed. Reg. 6622 (Dep't of Commerce Feb. 19, 1991).  In its review,

the Department analyzed the international trade behavior of a

number of respondents, including Shandong Huarong Machinery Co.,

Ltd. ("Huarong") and Tianjin Machinery Import & Export Corp.

("TMC").  See HFHTs From the PRC, 69 Fed. Reg. at 15,789-800.  On

March 10, 2005, Commerce issued its preliminary results

rescinding reviews with respect to some companies and finding

that others continued to sell their HFHTs in the United States at

less than normal value.[1]  See HFHTs, Finished or Unfinished, With

or Without Handles, From the PRC, 70 Fed. Reg. 11,934, 11,935,

11,937 (Dep't of Commerce Mar. 10, 2005) ("Preliminary Results").

Plaintiff and the respondents filed with the Department

case briefs contesting the Preliminary Results on June 13, 2005.

See Pl.'s Mem. 3.  The Department, having considered the parties'

arguments, published in the Federal Register the Final Results on

---

[1]     "Normal value" is the price at which the "foreign like
product is first sold (or, in the absence of a sale, offered for
sale) for consumption in the exporting country, in the usual
commercial quantities and in the ordinary course of trade and, to
the extent practicable, at the same level of trade as the [U.S.
price]."  19 U.S.C. § 1677b(a)(1)(B)(i).
        Because China is a nonmarket economy, Commerce generally
will calculate the normal value of merchandise produced and sold
in that country based on surrogate values "of the factors of
production utilized in producing the merchandise and to which
shall be added an amount for general expenses and profit plus the
cost of containers, coverings and other expenses."  19 U.S.C.
§ 1677b(c)(1).  The surrogate values "shall be based on the best
available information . . . in a market economy country or
countries considered to be appropriate by the administering
authority."  Id.

September 19, 2005.  *See* Final Results, 70 Fed. Reg. 54,897.  By

its Final Results, Commerce: (1) assigned TMC's sales the PRC-

wide dumping margins of 174.58 percent for axes/adzes, 139.31

percent for bars/wedges, 45.42 percent for hammers/sledges and

98.77 percent for picks/mattocks; and (2) assigned Huarong's

sales of axes/adzes a margin of 174.58 percent, and its sales of

bars/wedges a rate of 139.31 percent.  *See id.* at 54,898, 54,899.


                        STANDARD OF REVIEW

     When reviewing a final antidumping determination from

Commerce, the court "shall hold unlawful any determination,

finding, or conclusion found . . . to be unsupported by

substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'"  *Huaiyin*

*Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374

(Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)).  To determine whether substantial evidence

exists, the court must consider "the record as a whole, including

evidence that supports as well as evidence that 'fairly detracts

from the substantiality of the evidence.'"  *Id.* (quoting *Atl.*

*Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir.

1984)).

When reviewing the Department's treatment of various factors
when calculating normal value, "the proper role of this court,
. . . is to determine whether the methodology used by the
[agency] is in accordance with law . . . ." *Shieldalloy
Metallurgical Corp. v. United States*, 20 CIT 1362, 1368, 947 F.
Supp. 525, 532 (1996) (internal quotation marks & citations
omitted; ellipsis & alteration in original).  That is, "[a]s long
as the agency's methodology and procedures are reasonable means
of effectuating the statutory purpose, and there is substantial
evidence in the record supporting the agency's conclusions, the
court will not impose its own views as to the sufficiency of the
agency's investigation or question the agency's methodology."
*Id.*, 947 F. Supp. at 532 (internal quotation marks & citations
omitted).


DISCUSSION

I.   Scrap Offset to Normal Value for Huarong

The Department will grant a requesting respondent an offset
to normal value "for sales of the scrap generated during the
production of the subject merchandise,"  Def.'s Resp. Pl.'s Mot.
J. Upon Admin. R. ("Def's Resp.") 14 (citing *Shandong Huarong
Mach. Co. v. United States*, 29 CIT __, __, Slip Op. 05-54 at 3-4
(May 2, 2005) (not reported in the Federal Supplement), only if
the respondent can demonstrate that the scrap is "either resold

or has commercial value and re-enters the respondent's production
process."  Issues & Decision Mem. for the 13th Administrative
Review of HFHTs from the PRC (Dep't of Commerce Sept. 6, 2005)
("Issues & Dec. Mem.") at 30; *see also* 19 U.S.C. § 1677b(c)(1).[2]
In the Final Results, the Department concluded that Huarong
"[was] entitled to continue to receive an offset for its sales of
steel scrap" that was originally granted in the Preliminary
Results.  Issues & Dec. Mem. at 31.

Commerce accepted Huarong's proffered allocation method for
calculating the amount of the offset.  *See id.*  Under Huarong's
formula, the scrap offset was determined by "allocating total
scrap sales for the POR divided by total steel input used for the
production of both subject and non-subject merchandise and then
multiplied by the steel used in production of subject
merchandise."  *Id.*  Using this methodology, "Huarong was able to
take the total amount of scrap allocated for axes/adzes during
the POR to calculate a per-unit amount of scrap allocated to one
kilogram of the finished subject merchandise."  *Id.* at 32.

Ames insists that "[t]his scrap offset allowance was
erroneously granted . . . because the allocation method used to

---

[2]     That subsection provides, in pertinent part that, when
determining the normal value of merchandise produced in a
nonmarket economy country, Commerce shall rely on "the value of
the factors of production utilized in producing the merchandise
and to which shall be added an amount for general expenses and
profit plus the cost of containers, coverings, and other
expenses."  19 U.S.C. § 1677b(c)(1).

calculate the value of the scrap offset produces inaccurate
results."  Pl.'s Mem. 7.  Plaintiff raises three related "flaws"
in Huarong's allocation formula that it views as fatal to the
grant of a scrap offset.  First, Ames argues that Huarong's
methodology fails to capture accurately Huarong's sales of scrap
generated from the production of subject merchandise during the
POR, specifically because Huarong "admitted during the
administrative review that some of the scrap sold during the POR
was generated from both subject and non-subject merchandise
produced prior to the POR."  Pl.'s Mem. 7.  Second, Ames contends
that "Huarong has repeatedly conceded that it cannot
differentiate whether the scrap sold was produced from the
manufacture of subject or non-subject merchandise."  Pl.'s Mem.
8.  Third, Ames insists that "Huarong has stated that it cannot
correlate specific scrap sales to the production of subject
merchandise."  Pl.'s Mem. 8 (claiming that because Huarong cannot
establish that the scrap was produced from subject merchandise
and sold during the POR, Commerce lacks factual support for its
finding of a "'sufficient link' between recovery and sale of
scrap generated by subject merchandise").

      In addition, Ames contends that "[b]y accepting Huarong's
method to determine the scrap offset . . . the Department assumes
that the production of subject and non-subject merchandise
generates the same percentage of scrap from the same amount of

steel."  Pl.'s Mem. 8-9.  For plaintiff, this assumption results
in unavoidable inaccuracies "[g]iven the substantial physical
differences between the subject and non-subject merchandise that
[Huarong] produce[s] . . . ."  Pl.'s Mem. 9.

Finally, Ames maintains that the Department's grant of the
scrap offset based on Huarong's allocation method constitutes an
unlawful departure from the agency's past practice because it did
not accept this same allocation method in the eleventh review.
*See* Pl.'s Mem. 7 ("In the Final Results, the Department deviated
from its past agency precedent and granted Huarong a scrap offset
to normal value.").  Ames, therefore, asks the court to remand
this case "and direct the Department to deny Huarong's scrap
offset."  Pl.'s Mem. 9.

Commerce asserts that it was justified in granting the scrap
offset even though it acknowledges that Huarong "could not
differentiate between scrap generated from production of subject
and non-subject merchandise since scrap was collected for sale
from all of its workshops."  Issues & Dec. Mem. at 31.  For the
Department, this inability to differentiate did not preclude the
grant of the scrap offset because Huarong established an adequate
connection between the scrap resulting from its manufacture of
axes/adzes and the scrap sold.  *See id.* ("[W]hile the Department
determined that Huarong's accounting records cannot differentiate
scrap sales generated by subject and non-subject merchandise, the

Department finds that the scrap offset should not be denied

because there was a sufficient link between the recovery and sale

of scrap generated by subject merchandise.").

In addition, Commerce argues that it properly relied on the

data contained in Huarong's books and records as support for its

decision to grant the scrap offset.  The Department observes that

when making its calculations, it "usually utilizes company

records so long as they are maintained in accordance with the

exporting country's [generally accepted accounting principles]

and reasonably reflect actual costs."  Def.'s Resp. 14 (citing 19

U.S.C. § 1677b(f)(1)).[3]  For Commerce, "[r]ather than penalize

Huarong because its records are not exactly tailored to

antidumping calculations, the agency permissibly relied upon

Huarong's existing record keeping system and allocation."  Def.'s

Resp. 15.

As to the methodology used to calculate the amount of the

offset, Commerce insists that its decision to accept Huarong's

method was reasonable.  The Department points out that the

antidumping statute does not prescribe a method for calculating

scrap offsets but rather leaves the decision to Commerce's

---

[3]      Subsection 1677b(f)(1) codifies the intent expressed in
the Statement of Administrative Action ("SAA") that "[c]osts
shall be allocated using a method that reasonably reflects and
accurately captures all of the actual costs incurred in producing
and selling the product under investigation or review."  SAA,
Uruguay Round Agreements Act, accompanying H.R. Rep. No. 103-316,
656, 835 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4172.

discretion.  *See* Def.'s Resp. 15.  Thus, while conceding that "it

is preferable for costs to be tied as closely as possible to

subject merchandise," the Department urges that it "may consider

allocations between subject and non-subject merchandise, so long

as the agency is satisfied that the allocation method used does

not cause inaccuracies or distortions."  Def.'s Resp. 15 citing

19 C.F.R. § 351.401(g)(4) (2005)) ("The Secretary will not reject

an allocation method solely because the method includes expenses

incurred, or price adjustments made with respect to sales of

merchandise that does not constitute subject

merchandise . . . .").

Ames's claim presents both a legal and a factual question:

(1) whether the Department acted in accordance with law when it

accepted Huarong's allocation methodology and granted Huarong the

scrap offset (a challenge to the methodology); and (2) whether

Commerce supported with substantial evidence its decision to

grant Huarong the offset.  With respect to the legal aspect of

Ames's claim, the court notes that the antidumping statute is

silent as to how Commerce is to determine whether a respondent is

entitled to a scrap offset to normal value and, if so entitled,

how to calculate the amount of the offset.  Under such

circumstances, "the court does not simply impose its own

construction on the statute . . . [but] [r]ather . . . the

question for the court is whether the agency's answer is based on

a permissible construction of the statute."  *Chevron U.S.A. Inc.*

*v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

The Department, while not choosing to fill in the statutory gap

with a regulation, has understood the antidumping statute to

allow for the "offset [of] production costs with the sales

revenue only if the byproduct is either resold or has commercial

value and re-enters the respondent's production process."  Issues

& Dec. Mem. at 30; *see also Guangdong Chem. Imp. & Exp. Corp. v.*

*United States*, 30 CIT __, __, 460 F. Supp. 2d 1365, 1373 (2006)

("19 U.S.C. § 1677b(c) does not mention the treatment of by-

products, nonetheless, Commerce sometimes grants a respondent a

credit for a by-product generated in the manufacturing process

that is either reintroduced into production or sold for

revenue.") (internal quotation marks, citation & alterations

omitted).

　　The court finds that the Department acted in accordance with

law in granting Huarong the scrap offset.  It is clear from the

record that Commerce reasonably based its decision to grant

Huarong the offset on the information contained in the company's

accounting books and records demonstrating that the scrap was

sold.  "As a general rule, an agency may either accept financial

records kept according to generally accepted accounting

principles in the country of exportation, or reject the records

if accepting them would distort the company's true costs."  *Thai*

*Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1366 (Fed.

Cir. 1999).  Here, the Department accepted Huarong's books after

verification and found that the company sold a quantifiable

amount of scrap during the POR.

Commerce also verified: (1) the amount of scrap generated

during the POR from the production of subject and non-subject

merchandise; and (2) the total amount of steel used to produce

both kinds of merchandise.  Using these two numbers, Commerce

calculated a scrap percentage.  This percentage applied to the

verified amount of steel used in the manufacture of the

axes/adzes.  While this calculation does assume that both subject

and non-subject merchandise produce comparable amounts of scrap,

there is nothing on the record indicating that this assumption is

not reasonable.  *See* Issues & Dec. Mem. at 31 (acknowledging that

Huarong cannot differentiate between subject and non-subject

scrap sales, but granting the offset "because there was a

sufficient link between the recovery and sale of scrap generated

by subject merchandise").

Thus, although it would be possible to make a more accurate

adjustment were there more facts on the record, it cannot be said

that Commerce's methodology is unreasonable.  *See Pesquera Mares*

*Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir.

2001) ("[S]tatutory interpretations articulated by Commerce

during its antidumping proceedings are entitled to judicial

deference under *Chevron*.").  The court, therefore, concludes that Commerce was justified in granting Huarong a scrap offset.

As to Ames's claim that Commerce violated its past practice in granting the offset, the Department insists:

> Although [Ames] is correct that in a past administrative review of this order the Department denied Huarong the scrap offset, the Department finds that the facts of this review regarding Huarong's offset are distinguishable.  First, while the Department determined that Huarong's accounting records cannot differentiate scrap sales generated by subject and non-subject merchandise, the Department finds that the scrap offset should not be denied because there was a sufficient link between the recovery and sale of scrap generated by subject merchandise.  This is contrary to the facts of the [eleventh review], where the Department denied Huarong the offset because there was an insufficient link between the recovery and sale of subject merchandise.

Issues & Dec. Mem. at 31 (internal citations omitted).

The court finds that Commerce has not violated its past practice.  While it is true that Commerce initially denied Huarong a scrap offset in the eleventh administrative review, on remand from this Court, the Department reopened the record, considered the additional evidence regarding Huarong's sales of scrap during the period of review and granted the offset.  *See Shandong Huarong Mach. Co.*, 29 CIT at __, Slip Op. 05-54 at 8. That determination was sustained by this Court.  Thus, the past practice on which plaintiff relies was not sustained by this Court, while the practice to which it objects was.  *See Shandong*

*Huarong Mach. Co. v. United States*, 31 CIT __, __, Slip Op. 07-3
at 9 (Jan. 9, 2007) (not reported in the Federal Supplement).

Because the court finds that Commerce properly based its
decision to grant Huarong the steel scrap offset on the company's
financial books and records, applied a reasonable methodology,
supported its conclusion with substantial evidence and did not
violate past agency practice, the court sustains Commerce's grant
of the offset.

II.  Surrogate Value for Brokerage and Handling Expenses

Plaintiff next insists that Commerce erred in using the data
contained in Certain Hot-Rolled Carbon Steel Flat Products from
India, 66 Fed. Reg. 50,406 (Dep't of Commerce Oct. 3, 2001) ("HR
from India"), as a surrogate value for brokerage and handling
expenses.  *See* Pl.'s Mem. 9-10.  Commerce maintains that it
relied on the value in HR from India because it was reliable and
because it was "the only [brokerage and handling] value on the
record of this review . . . ."  Issues & Dec. Mem. at 34.

In support of its position, Ames urges that prior to the
publication of the Final Results, it placed on the record the
brokerage and handling value contained in Certain Stainless Steel
Wire Rod from India, 63 Fed. Reg. 48,184 (Dep't of Commerce Sept.
9, 1998) ("SSWR").  *See* Pl.'s Mem. 10.  Thus, Ames insists that
"[t]he Department erroneously found that the surrogate value from

HR from India was the only [brokerage and handling] value on the record."  Pl.'s Mem. 10.

According to Ames, it placed the SSWR brokerage and handling data on the record on two different occasions, both taking place before Commerce reached its final determination.  Plaintiff claims that it first notified Commerce of the alternate surrogate value nine months prior to the Final Results in a letter to the Department.  *See* Pl.'s Mem. 10.  In its letter, plaintiff stated:

> For purposes of valuing [r]espondents'
> brokerage and handling expenses, the
> Department should continue to utilize the
> public version questionnaire response placed
> on the record in Stainless Steel Wire Rod
> from India, 63 Fed. Reg. 48,184 (Sept. 9,
> 1998) (admin. rev., final).  This surrogate
> has been consistently used by the Department
> in this and in dozens of other recent
> administrative proceedings.

Letter from Wiley Rein LLP to The Honorable Donald L. Evans, re: HFHTs From the PRC: Publicly Available Information on Factor Values (Dec. 28, 2004) (quoted in Pl.'s Mem. 10).

Ames also asserts that it put the SSWR brokerage and handling value on the record through its case brief in response to Commerce's Preliminary Results filed on June 13, 2005.  *See* Pl.'s Mem. 10.  In its case brief, Ames stated that it had placed the SSWR value on the record by way of its December 28, 2004, letter.  *See* Case Br. of Ames True Temper (June 13, 2005) 8-9.

Plaintiff further argues that Commerce was on notice that the SSWR data existed because "[i]n the Preliminary Results, the

Department stated that it had used the rates reported in SSWR to value the [brokerage and handling] costs." Pl.'s Mem. 11 (citing Preliminary Results, 70 Fed. Reg. at 11,941). While the Preliminary Results do contain this statement, Commerce, in fact, used the HR from India data. Nonetheless, for plaintiff, Commerce's indication in the Preliminary Results that it determined the value of brokerage and handling costs using the SSWR data precluded the Department from claiming that the data was on the record.

Finally, plaintiff claims that Commerce violated its past practice of valuing brokerage and handling using the value in SSWR. *See* Pl.'s Mem. 13 ("Although the Department may deviate from its past practice, it must provide an explanation for its departure."). As plaintiff states:

> The Department has used the SSWR surrogate in many other administrative proceedings, including several prior administrative reviews of this antidumping order. For example, in the eleventh review of this order, the Department determined that SSWR was the most appropriate surrogate value. . . .
>
> The Department has failed to provide any reasons for its departure from its prior practice. Furthermore, nothing has changed in the review under appeal that would alter the Department's prior holding and findings.

Pl.'s Mem. 12, 13 (internal citations omitted).

Commerce counters by first pointing out that plaintiff at no point contests the reasonableness of the HR from India data. *See*

Def.'s Resp. 17 ("Ames maintains that Commerce should have used

the surrogate value used in the prior review, i.e., the

calculations from SSWR -- without ever maintaining that the

surrogate value used is unreasonable.").

Next, Commerce insists that Ames never put its preferred

data on the record:

> [Ames] argues that, for the final results, the
> Department should value [brokerage and handling]
> using a value from SSWR [new shipper reviews].
> However, the only [brokerage and handling] value
> on the record of this review is the one used in
> the preliminary results. [Title 19 C.F.R. §]
> 351.301(c)(3)(ii) of the Department's regulations
> allows interested parties to submit factor
> information up to 20 days after the preliminary
> results.  Consequently, we note that after the
> preliminary results, [Ames] had an opportunity to
> place the SSWR . . . [brokerage and handling]
> value on the record, but did not.  The Department
> cannot use information not on the record of this
> review for purposes of valuing [brokerage and
> handling] in these final results and, therefore,
> will continue to use the [brokerage and handling]
> surrogate value from HR from India.  We note that
> the brokerage and handling value in HR from India
> is generally contemporaneous with the POR and,
> thus, is an appropriate surrogate.

Issues & Dec. Mem. at 34.  Thus, it is the Department's position

that merely referencing the SSWR data was not enough; if Ames

wanted the value considered, it should have placed it on the

record.

In addition, the Department insists that its reference to

the SSWR data in the Preliminary Results was a mistake.  *See*

Def.'s Resp. 18.  Commerce states that "[t]his inadvertency does

not change the information upon the record.  As the underlying

calculations show, Commerce used the calculations from [HR from

India] in the Preliminary Results."  Def.'s Resp. 18 (citation

omitted).

Finally, in response to Ames's claim that the use of the HR

from India value constituted an unlawful deviation from its past

practice, Commerce notes that "what represents the best available

information may vary on a case-by-case basis."  Def.'s Resp. 19

(internal quotation marks omitted).  Thus, the Department

maintains that it was not bound to use information that was not

on the record simply because it had previously used that

information in earlier reviews.

Where the subject merchandise is exported from a nonmarket

economy country, Commerce "shall determine the normal value of

the subject merchandise on the basis of the value of the factors

of production utilized in producing the merchandise . . . ."

19 U.S.C. § 1677b(c)(1).  The statute further directs Commerce to

value the factors of production "based on the best available

information regarding the values of such factors in a market

economy country or countries considered to be appropriate by the

[Department]."  *Id.*

As the Court of Appeals for the Federal Circuit has held,

"'the process of constructing foreign market value for a producer

in a nonmarket economy country is difficult and necessarily

imprecise.'"  *Nation Ford Chem. Co. v. United States*, 166 F.3d
1373, 1377 (Fed. Cir. 1999) (quoting *Sigma Corp. v. United
States*, 117 F.3d 1401, 1408 (Fed. Cir. 1997)).  Notably, Ames
does not take issue with the reasonableness of the HR from India
data but rather bases its demand for a remand solely on its
argument that, because the Department used the SSWR data as a
surrogate value for brokerage and handling costs in prior
reviews, it had to explain why it did not rely on that data when
making the same valuation in this review.

     For Commerce, the HR from India value for brokerage and
handling was the best information available because: (1) it was
"generally contemporaneous with the POR"; and (2) it was the
"only [brokerage and handling] value on the record of this
review . . . ."  Issues & Dec. Mem. at 34.

     The court sustains Commerce's determination.  First, despite
plaintiff's claim to the contrary, at no point in any of its
filings did Ames place the SSRW brokerage and handling value on
the record.  Instead, plaintiff merely made mention of the SSWR
source.  Next, Ames's insistence that Commerce's previous use of
the data and, in this case, mistaken reference to the SSWR source
in the Preliminary Results created an obligation to use the SSWR
brokerage and handling value overstates the case.  As has been
previously noted, plaintiff knew that the SSWR data was not used
by Commerce in the Preliminary Results.  If Ames wished Commerce

to employ the brokerage and handling surrogate value from SSWR in

its calculation of the normal value of Huarong's axes/adzes, it

should have made both its position and the actual value amount

known to the Department within twenty days after publication of

the Preliminary Results.  *See* 19 C.F.R. § 351.301(c)(3)(ii)

(permitting an interested party to submit data to be used for

valuing factors of production in the final results 20 days after

publication of the preliminary results).

Most importantly, the failure to use a particular data set

from a previous investigation does not constitute a past

practice.  It is well settled that what is the best available

information may change from one investigation to the next.  *See*

*Nation Ford Chem. Co.*, 166 F.3d at 1377 ("Whether . . . analogous

information from the surrogate country is 'best' will necessarily

depend on the circumstances . . . .").  At no point does Ames

claim that the HR from India data is unreliable, nor does it

contend that the SSWR data is superior to that used by Commerce.

Thus, the court sustains Commerce's use of the HR from India

surrogate value for brokerage and handling.


III. Huarong's Production of Metal Pallets

Ames further asserts that the Department unreasonably denied

its request that Commerce "reopen the administrative record and

require the respondents to report the associated factors used in

producing metal pallets." Pl.'s Mem. 13.  In particular, Ames

argues that Commerce had to account for the cost of "oxygen,

acetylene, and welding solder or rods" or other materials used

for welding steel together to construct the metal pallets even

though Commerce insists that there was no evidence on the record

that such materials were employed in the pallet-production

process.  Pl.'s Mem. 13, 14.  That is, given: (1) that Huarong

made its pallets using a welding process; and (2) that the record

contained no values for inputs necessary to weld the pallets

together, Commerce should have conducted a more detailed

investigation.

     To support its position, Ames relies on this Court's finding

in *Shandong Huarong Mach. Co. v. United States*, 29 CIT __, Slip

Op. 05-54 (May 2, 2005).  In remanding that case, the Court held

that "it is not sufficient for Commerce to simply rely on the

absence of evidence to reach its decision; rather, Commerce must

provide findings and analysis justifying its determination."

*Id.*, Slip Op. 05-54 at 23.  For Ames, the Court's decision in

*Shandong* applies here and requires remand of the Final Results

with instructions for Commerce to reopen the record and collect

more evidence concerning Huarong's construction of metal pallets.

Specifically, Ames asserts that remand is necessary because the

Department "supported its decision . . . by explaining that

'there is no evidence on the record to indicate that Huarong has

used solder, welding rods or inert gases in the manufacture of

pallets.'"  Pl.'s Mem. 15 (quoting Issues & Dec. Mem. at 36).

In addition, Ames contends that Commerce's conclusion that

the verification report showed that there was no welding rod,

solder or inert gases at Huarong's packing facility, is

erroneous.  *See* Pl.'s Mem. 15.  According to Ames:

> Contrary to the Department's claim, the
> verification report did not include an
> affirmative finding that Huarong did not use
> or have any of the listed associated factors.
> Rather, the verification report simply did
> not mention or include observations regarding
> any inputs associated with the production of
> steel pallets, other than metal.

Pl.'s Mem. 15 (emphasis & citation omitted).

The Department maintains that it reasonably declined to

reopen the record.  For Commerce:

> Huarong reported all labor, electricity and
> steel used in the production of pallets and
> . . . the Department verified these usage
> factors.  A careful review of Huarong's
> verification report reveals that the
> Department noted no solder, welding rods, gas
> tanks or inert gases in Huarong's packing
> facility.  In addition, there is no evidence
> on the record to indicate that Huarong has
> used solder, welding rods or inert gases in
> the manufacture of pallets.

Issues & Dec. Mem. at 36.

The Department does not view this conclusion as one based on

the absence of evidence.  *See* Def.'s Resp. 20.  It is Commerce's

position that "[a]bsent evidence that a company actually utilizes

a particular input, there is no basis to value that input."

Def.'s Resp. 19.  Commerce further emphasizes that it verified
Huarong's reported factors of production relating to metal
pallets at Huarong's packing facility and did not find any
evidence that welding rods, solder or inert gases were used.  *See*
Def.'s Resp. 19 ("Because Huarong's verified factors of
production do not include rivets, welding flux, welding solder,
acetylene, and oxygen, it is entirely lawful to decline to value
these items.") (emphasis omitted)).  In other words, "Commerce
does not assume that a company utilizes a particular input.
Rather, [it] values the factors of production actually used."
Def.'s Resp. 20.

Ames does not ask Commerce to assume the use of a particular
input but rather points out that some input must have been used
to construct the pallets.  *See* Pl.'s Reply 7 ("Although the
factors of production for metal pallets may include labor,
electricity and steel, common sense dictates that other
unreported factors had to be used to produce the pallets. . . .
[I]t is inexplicable how the respondent could have manufactured
the pallets without utilizing any other inputs.").  This
proposition seems irrefutable.  Therefore, despite Commerce's
having verified Huarong's responses, it is apparent that
something held the pallets together and therefore something has
been overlooked.  Commerce is instructed to reopen the record and
obtain additional evidence regarding Huarong's production of

metal pallets.


IV.  Commerce's Application of By-Product Credit and Packing
     Materials Cost Directly to Normal Value

     Next, Ames urges the court to find unlawful Commerce's

decision to apply the credit for Huarong's by-product sales and

add the value of Huarong's packing material costs directly to

normal value.  Ames contends that "[t]he Department erred in

directly adding the packing material costs to and subtracting the

byproduct offset from [normal value].  Instead, the Department

should have added the cost of packing materials to the total cost

of manufacturing ("TOTCOM"), and deducted the byproduct offset

from [cost of manufacturing], before applying the financial

ratios to them."  Pl.'s Mem. 17.  For its part, the Department

maintains that its methodology is consistent with its current

practice of applying the by-product offset and cost of packing

materials directly to normal value where the surrogate financial

statement does not specifically account for those items.  *See*

Def.'s Resp. 21.

     As noted, when constructing the normal value of merchandise

exported from a nonmarket economy country, Congress has provided

that Commerce base its determination on "the value of the factors

of production utilized in producing the merchandise . . . ."

19 U.S.C. § 1677b(c)(1).  In doing so, the Department typically

relies on factor of production data from a surrogate country,

i.e., a "market economy countr[y] that [is] at a level of
economic development comparable to that of the nonmarket economy
country . . . ."  19 U.S.C. § 1677b(c)(4); *see Shakeproof
Assembly Components, Div. of Ill. Tool Works, Inc. v. United
States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001).  Once Commerce has
determined the value of the factors of production, the statute
mandates that it add to that value "an amount for general
expenses and profit plus . . . other expenses."  19 U.S.C.
§ 1677b(c)(1); *see also Guandong Chem. Imp. & Exp. Corp.*, 30 CIT
at __, 460 F. Supp. 2d at 1373.  In calculating the amount of
these expenses, Commerce generally applies financial ratios
derived from a surrogate company's (1) overhead; (2) selling,
general and administrative ("SG&A") expenses; and (3) profit to
the surrogate factors of production values.

Here, Commerce used as its surrogate source financial data
reported by 2,031 Public Limited Companies in India for the
period 2002-2003 contained in the August 2004 Reserve Bank of
India Bulletin ("RBI Bulletin") to construct the overhead and
SG&A surrogate financial ratios.  *See* Preliminary Results, 70
Fed. Reg. at 11,942.  Because it could find no evidence of how
by-product sales or packing materials were treated in the RBI
Bulletin, Commerce applied the amounts associated with these
items directly to normal value.  *See* Issues & Dec. Mem. at 38.

Ames's primary argument is that Commerce unreasonably

concluded that the surrogate companies' financial statements in

the RBI Bulletin did not account for the by-product offset or

packing material costs simply because the statements did not list

those values.  *See* Pl.'s Mem. 17.  For plaintiff, "[r]egardless

of whether costs and materials are individually identified in a

surrogate company's financial statements, it can be assumed that

all of the costs involved in producing merchandise, such as

direct materials, scrap offsets, and packing materials, will be

included in the financial statements."  Pl.'s Mem. 17 (citing

Floor-Standing, Metal-Top Ironing Tables and Certain Parts

Thereof From the PRC, 69 Fed. Reg. 35,296 (Dep't of Commerce June

24, 2004) (final determination)).

In support of its position, Ames argues:

> In order to calculate an accurate normal
> value, the Department must apply the overhead
> and SG&A ratios on an apples-to-apples basis.
> This can only be accomplished by including
> the same costs that were used to derive the
> overhead and SG&A ratios in the production
> costs in the calculation of [cost of
> manufacture] and TOTCOM.  Thus, the
> Department should have deducted the
> respondent's byproduct offset from [cost of
> manufacturing] before applying the overhead
> ratio, which was devised from financial data
> that accounted for byproduct offset.
> Similarly, the Department should have added
> packing material costs to TOTCOM before
> applying the SG&A ratio, in which packing
> material costs were accounted for.

Pl.'s Mem. 18-19.

As previously mentioned, "as long as the agency's

methodology and procedures are reasonable means of effectuating

the statutory purpose, and there is substantial evidence in the

record supporting the agency's conclusions, the court will not

impose its own views as to the sufficiency of the agency's

investigation or question the agency's methodology." *Shieldalloy*

*Metallurgical Corp.*, 20 CIT at 1368, 947 F. Supp. at 532

(internal quotation marks & citations omitted).  The court finds

that Commerce has supported with substantial evidence its

practice of directly adding the packing material costs to – and

subtracting the by-product offset from – normal value when such

values are not specifically accounted for in the surrogate

financial statements upon which the surrogate financial ratios

are based.

    First, the court observes that both Ames's preferred

methodology and that of Commerce require the making of

assumptions.  While Ames does not dispute Commerce's conclusion

that the financial statements found in the RBI Bulletin do not

mention either by-product credits or packing material costs, it

insists that Commerce must assume that those surrogate companies'

financial statements took the unlisted values into account.

Commerce, on the other hand, assumes that the absence of specific

values for by-product sales and packing material costs from the

surrogate financial statements means that they were not taken

into account.

The court cannot agree with Ames.  In using its preferred methodology, Commerce followed its reasoning in Fresh Garlic From the PRC, 69 Fed. Reg. 33,626 (Dep't of Commerce June 16, 2004) at cmt. 6.  *See* Issues & Dec. Mem. at 38.

> Where the Department cannot ascertain from the surrogate financial information whether packing expenses are in the surrogate financial ratio calculations, such as in the denominator, it is not necessarily appropriate to include packing expenses in the production costs to which the surrogate financial ratios are applied.  If packing expenses are not in the denominator of surrogate financial ratio calculations or, as here, we cannot identify where and to what extent such expenses are in the ratio calculation, and we apply the ratios to production costs that include amounts for packing materials and labor, we may distort the amount of overhead, SG&A, and profit that we calculate for the cost of production. Accordingly, for the final results of these reviews, in calculating the amount of overhead, SG&A, and profit included in the cost of production, we have determined not to apply the surrogate financial ratios to production costs that include packing expenses (i.e., we have removed packing expenses from the production-cost build-up to which we apply the surrogate ratios).

Fresh Garlic From the PRC, 69 Fed. Reg. 33,626 at cmt. 6.  In like manner, "Commerce developed a practice that provided for the application of a by-product credit to normal value when financial statements used as a surrogate do not expressly address the treatment of by-products."  Def.'s Resp. 21.

Even though Commerce's methodology requires the making of an assumption, i.e., that the RBI Bulletin financials do not capture

by-product sales or packing material costs, the court cannot say

that its assumption is unreasonable.  As the *Guandong* Court

noted, "[e]ven if Guandong's alternative approach to

implementation of the statute were reasonable, the court could

not substitute its own view of the statute for Commerce's

reasonable interpretation or implementation." *Guandong Chem.*

*Imp. & Exp. Corp.*, 30 CIT at __, 460 F. Supp. 2d at 1376 (citing

*Chevron U.S.A. Inc.*, 467 U.S. at 844).

Therefore, because Commerce has adequately explained its

decision to apply the by-product offset and packing material

costs directly to normal value, the court upholds the

Department's methodology.


V.   Changed Circumstances Review

Finally, Ames asserts that, because Commerce applied adverse

facts available ("AFA") to Huarong's and TMC's sales of

bars/wedges in the ninth, twelfth and thirteenth reviews based on

their participation in the agency sales invoicing scheme, the

Department should have granted Ames's request that it initiate a

changed circumstances review for the tenth and eleventh reviews

pursuant to 19 U.S.C. § 1675(b)[4] and 19 C.F.R. § 351.216.[5]  *See*

---

[4]     Subsection 1675(b) provides, in pertinent part:

        Whenever the administering authority
        . . . receives information concerning, or a
                                        (continued...)

Pl.'s Mem. 19; Pl.'s Supplemental Br. 1-4; *see also Shandong*

*Huarong Mach. Co. v. United States*, 30 CIT __, __, 435 F. Supp.

2d 1261, 1270 (2006) (finding that respondents' failure to

provide relevant information about their agency sales invoicing

scheme justified Commerce's application of AFA).  By its request,

Ames had hoped to demonstrate that the agency sales invoicing

scheme was present during the period of investigation for each of

those reviews too.  In the tenth and eleventh reviews, Commerce

did not apply AFA to respondents' bars/wedges sales.

Commerce maintains that its "refusal to reopen closed cases

remains squarely within [its] discretion," and is not reviewable

---

[4](...continued)
        request from an interested party for a review
        of——

                (A) a final affirmative
                determination that resulted in an
                antidumping duty order under this
                subtitle or a finding under the
                Antidumping Act, 1921, or in a
                countervailing duty order under
                this subtitle or section 1303 of
                this title, . . .

        which shows changed circumstances sufficient
        to warrant a review of such determination or
        agreement, the administering authority
        . . . shall conduct a review of the
        determination or agreement after publishing
        notice of the review in the Federal Register.

19 U.S.C. § 1675(b)(1).

        [5]    The regulations permit the Department to conduct a
changed circumstances review either on request from an interested
party or on its own initiative.  *See* 19 C.F.R. § 351.216(b), (d).

by this Court.  Def.'s Resp. 24 (citing *Interstate Commerce*

*Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 278 (1987);

*United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515,

534-35 (1946)).  For the Department, "an agency's refusal to

reopen a closed case is generally committed to agency discretion

by law and therefore exempt from judicial review."  Def.'s Resp.

24 (internal quotation marks & citation omitted).

     With respect to Commerce's insistence that its denial of

plaintiff's request is immune from judicial review, the court

finds that Commerce overstates its claim that an appeal of a

denial of a request for a changed circumstances review cannot be

heard.  This Court has recently held otherwise.  *See Trs. in*

*Bankr. of N. Am. Rubber Thread Co. v. United States*, 30 CIT __,

__, 464 F. Supp. 2d 1350, 1355-56 (2006) (finding jurisdiction

under subsection 1581(i) to hear an appeal of Commerce's

determination denying a request for a changed circumstances

review).  Nonetheless, the court finds that, here, Ames has

asserted no valid basis for jurisdiction.  Ames claims that the

court has jurisdiction to hear its appeal under 28 U.S.C.

§ 1581(c).  Compl. ¶ 1.  Subsection (c) provides this Court with

jurisdiction to hear appeals of those determinations listed in 19

U.S.C. § 1516a.  *See Shinyei Corp. of Am. v. United States*, 355

F.3d 1297, 1304 (Fed. Cir. 2004) ("Section 1581(c) provides the

court with exclusive jurisdiction over actions commenced under

section 516A of the Tariff Act [19 U.S.C. § 1516a].").   A determination by Commerce (as distinct from the United States International Trade Commission) denying a request for a changed circumstances review is not among the listed determinations that can be reviewed pursuant to section 1516a.  *See AOC Int'l v. United States*, 17 CIT 1412, 1414-15 (1993) (not reported in the Federal Supplement); *Trs. in Bankr. of N. Am. Rubber Thread Co.*, 30 CIT at __, 464 F. Supp. 2d at 1355-56.  Thus, despite Ames's claims to the contrary, the court has no jurisdiction under 28 U.S.C. § 1581(c) to hear its appeal regarding Commerce's denial of a request to initiate a changed circumstances review.

## CONCLUSION

Based on the foregoing, the court sustains in part and remands Commerce's Final Results.  On remand, Commerce is instructed to render a determination in accordance with this opinion.  Remand results are due on December 3, 2007.  Comments on the remand results are due on January 2, 2008.  Any replies to such comments are due on January 14, 2008.

/s/ Richard K. Eaton
Richard K. Eaton

Dated:     August 31, 2007
           New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____   By: _____
                                        Deputy Clerk